UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No. 15-cr-467

          Plaintiff

     v.                                                    MEMORANDUM OPINION


Esmeralda Hernandez,

          Defendant


    This matter is before me to determine whether Defendant Esmeralda Hernandez is competent to stand trial. For the reasons stated below, I find Ms. Hernandez is not competent to stand trial.

## BACKGROUND

    On December 3, 2015, Ms. Hernandez was a passenger in a vehicle driven by Defendant Arely Gonzalez-Correa. (Doc. No. 1-1 at ¶ 4). Also in the vehicle were two teenage undocumented aliens. (*Id.* at ¶¶ 4 & 12). Officers from the Ohio State Highway Patrol and United States Border Patrol stopped the vehicle for a lane violation in Sandusky County, Ohio. (*Id.* at ¶¶ 3 & 4). The four vehicle occupants were detained on suspicion of human smuggling and transported to the Sandusky Bay Border Patrol Station. (*Id.* at ¶ 5). Ms. Hernandez was read her *Miranda* rights and questioned. (*Id.* at ¶ 7). After being questioned, on December 4, 2015, Ms. Hernandez was arrested for aiding and abetting alien smuggling in violation of 8 U.S.C. § 1324. (Doc. No. 5). At Ms. Hernandez's initial appearance, the Federal Public Defender's Office was appointed to represent her.

    Ms. Hernandez was subsequently indicted on one count of harboring/transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and one count of aiding and abetting the

harboring/transporting of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II).  (Doc. No. 9).

In a superseding indictment, Gonzalez-Correa was also indicted on one count of

harboring/transporting illegal aliens.  (Doc. No. 18).

On July 18, 2016, Ms. Hernandez filed a motion requesting a competency hearing.  (Doc.

No. 39).  I granted the motion and ordered Ms. Hernandez evaluated by the Court Diagnostic and

Treatment Center.  (Doc. No. 40).  Ms. Hernandez also obtained an independent evaluation.

On November 30, 2016, I held a competency hearing.  At that hearing, I admitted two

reports.  The first, offered by Ms. Hernandez, was a forensic psychological evaluation and forensic

neuropsychological evaluation performed by John Matthew Fabian, Psy.D., which supported Ms.

Hernandez's contention that she was not competent to stand trial.  (Doc. No. 45-1).  The second,

offered by the government, was a psychiatric evaluation performed by Thomas G. Sherman, M.D.,

Medical Director of the Court Diagnostic and Treatment Center, which supported the government's

contention that Ms. Hernandez was competent to stand trial.  (Doc. No. 45).  The parties offered no

other evidence or argument.  I took the matter under advisement and subsequently found Ms.

Hernandez was suffering from a mental defect rendering her mentally incompetent to the extent that

she was unable to understand the nature and consequences of the proceedings against her or to

assist properly in her defense.  (Doc. No. 46 at 7).  I therefore ordered her committed to the custody

of the United States Attorney General for hospitalization and treatment pursuant to 18 U.S.C. §

4241(d).  (*Id.* at 7-8).

Ms. Hernandez arrived at the Federal Medical Center ("FMC"), Carswell on February 28,

2017.  (Doc. No. 51).  In a letter dated July 7, 2017, the warden at FMC Carswell notified me that

Ms. Hernandez had undergone competency restoration and is now, in the opinion of FMC Carswell

clinical staff, competent to proceed in this case.  (Doc. No. 52 at 1).  Included in this notice was a

forensic evaluation of Ms. Hernandez, which was conducted by forensic psychologist Amor Correa,

Ph.D. and reviewed by chief psychologist Daniel D. Kim, Ph.D. (*Id.* at 3-16). So I set the matter for another competency hearing.

On December 4, 2017, I received a letter from Ms. Hernandez, herself, asking for a new lawyer. She cited communication issues due to her English proficiency and dyslexia. Ms. Hernandez said she needed a lawyer who speaks and comprehends Spanish. She also wrote that she needed to know what she was being charged with.

On December 20, 2017, I called the matter for a competency hearing, and at that time Ms. Hernandez orally moved to retain counsel. I postponed the competency hearing to give Ms. Hernandez time to secure new counsel. When Ms. Hernandez's efforts failed, I appointed her a new attorney.

On March 5, 2018, I held a second competency hearing. Ms. Hernandez had again obtained an independent evaluation performed by Dr. Fabian. So Drs. Fabian and Correa testified at the competency hearing, and I admitted into evidence their respective reports, curricula vitae, and observational notes concerning Ms. Hernandez that were recorded and kept by Bureau of Prisons staff. (Gov't Exhs. 1-3 & Def. Exhs. A-C). Due to scheduling constraints, I continued the competency hearing until March 13, 2018, at which time I heard arguments with respect to Ms. Hernandez's competency and took the matter under advisement.

## STANDARD

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The test for competence asks whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see also* 18 U.S.C. § 4241(a).

"In determining a defendant's competence, the court considers several factors, including evidence of a defendant's irrational behavior, [Defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial." *United States v. Miller*, 531 F.3d 340, 348 (6th Cir. 2008) (internal quotation marks and citation omitted). "An attorney's opinion about his client's competency is likewise a relevant factor." *United States v. Willis*, 362 F. App'x 531, at *3 (6th Cir. Jan. 28, 2010); *Owens v. Sowders*, 661 F.2d 584, 586 (6th Cir. 1981).

Though 18 U.S.C. § 4241 is silent as to who bears the burden of proving competence or incompetence, the Sixth Circuit has determined the government must prove by a preponderance of the evidence that a defendant is competent to stand trial. *United States v. Hoyt*, 200 F. Supp. 2d 790, 792 (N.D. Ohio 2002) (citing *United States v. Chapple*, 47 F.3d 1170, at *2 (6th Cir. Jan. 6, 1995) (per curiam) (unpublished table opinion)); 18 U.S.C. § 4241(d). But "which side bears the burden of proof only matters where the proof is in equipoise, that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *United States v. Stafford*, No. 1:12 CR 238, 2013 WL 1694033, at *1 n.1 (N.D. Ohio April 18, 2013) (citing *Medina v. California*, 505 U.S. 437, 449 (1992)) (internal quotation marks omitted).

## DISCUSSION

### Dr. Correa's Evaluation

On February 28, 2017, Ms. Hernandez arrived at FMC Carswell. (Gov't Exh. 2 at 9). She was there until early July 2017, during which time Dr. Correa and FMC Carswell staff observed and evaluated her. (Gov't Exh. 2). In her report dated July 5, 2017, Dr. Correa diagnosed Ms. Hernandez with mild neurocognitive disorder due to traumatic brain injury; malingering; antisocial personality disorder; cannabis use disorder, severe, in a controlled environment; alcohol use disorder, severe, in a controlled environment; and cocaine use disorder, severe, in a controlled environment. (Gov't Exh. 2 at 14-15).

In coming to these diagnoses, Dr. Correa administered several tests and relied on Ms. Hernandez's self-reported drug use. Dr. Correa administered the b Test, which measures the test-taker's effort level. (*Id.* at 11). Ms. Hernandez scored 414 on the test, while, generally, ninety percent of test-takers with documented brain injuries score lower than 90 while applying normal effort. (*Id.*). Ms. Hernandez's score put her in the "suspect effort" range. (*Id.*).

Dr. Correa also administered the Test of Memory Malingering ("TOMM"). (*Id.*). This test consists of two learning trials and a retention trial, each scored on a fifty-point scale. (*Id.*). Ms. Hernandez scored forty-eight on the first learning trial and forty-seven on the second. (*Id.*). Ms. Hernandez's score on the second learning trial was below that achieved by more than ninety-five percent of "individuals living in the community." (*Id.*). On the retention trial, Ms. Hernandez scored thirty-six, which is "below scores typically obtained even by patients with cognitive impairment, traumatic brain injury, or dementia." (*Id.* at 11-12). This therefore suggested Ms. Hernandez "was not putting forth maximum effort and likely exaggerated memory deficits." (*Id.* at 12).

Dr. Correa administered the Structured Inventory of Malingered Symptomatology ("SIMS"), which is designed to provide "an overall estimate of the likelihood an individual is feigning symptoms of psychiatric or cognitive impairment." (*Id.*). Ms. Hernandez obtained a score of forty-one. (*Id.*). Any score above fourteen puts the test-taker in the range of suspected malingering. (*Id.*). This test also generates scores for five scales – psychosis, neurological impairment, amnestic disorders, low intelligence, and affective disorders. (*Id.*). These scores "provide qualitative information regarding the nature of symptoms endorsed by a respondent." (*Id.*). Ms. Hernandez scored in the range of suspected malingering for all five scales. (*Id.*).

Dr. Correa also administered the Comprehensive Test of Nonverbal Intelligence – Second Edition ("CTONI-2"), which tests intellectual functioning. (*Id.*). This test's full scale composite score, according to Dr. Correa's report, "is the best, most comprehensive estimate of a person's

overall general intellectual ability." (*Id.*). Ms. Hernandez obtained a score of forty-three on this test, which puts her in the "very poor" range. (*Id.*). But Dr. Correa determined Ms. Hernandez's CTONI-2 score was "not indicative of her true level of intellectual functioning" and invalidated this score based on Ms. Hernandez's low scores on the b Test, TOMM, and SIMS. (*Id.*).

Finally, Dr. Correa administered the Evaluation of Competency to Stand Trial – Revised, Spanish Research Edition ("ECST-R SRE"). (*Id.* at 13). Dr. Correa did not interpret Ms. Hernandez's raw scores, because there are no published normative studies for this evaluation. (*Id.*). Instead, Dr. Correa summarized and analyzed Ms. Hernandez's responses to the questions asked during the test. (*Id.*). Ms. Hernandez was able to identify courtroom procedures and the roles of judges, prosecutors, and defense attorneys. (*Id.*). She could identify the crime with which she had been charged and talk about the facts related to that charge. (*Id.* at 13-14). Ms. Hernandez expressed an understanding that to plead guilty to a crime means the defendant is admitting responsibility for that crime. (*Id.* at 14). Ms. Hernandez did not know what sentence she might face if convicted. (*Id.*).

Dr. Correa also evaluated Ms. Hernandez's ability to assist her counsel. (*Id.*). Dr. Correa's report reveals that Ms. Hernandez felt she had a good relationship with her then-attorney Donna Grill, that Ms. Hernandez discussed with Ms. Grill her desire to fight another inmate, and that Ms. Hernandez understands how she is to behave in court. (*Id.*).

In addition to Dr. Correa's testing, Ms. Hernandez attended competency restoration classes taught in both English and Spanish. (*Id.* at 12-13). These classes consisted of instruction on the roles of court participants and opportunities to role-play courtroom scenarios. (*Id.* at 12). Ms. Hernandez's attendance at the classes was inconsistent. (*Id.*). When she did attend, she appeared irritated, sat with crossed arms, appeared disengaged, and did not take notes. (*Id.* at 12-13). She stated outright that she did not want to attend these classes and asked Dr. Correa if she could stop going. (*Id.* at 13). Ms. Hernandez behaved similarly in both English and Spanish classes. (*Id.*). But

when Dr. Correa prompted her to participate in the Spanish classes, Ms. Hernandez could read aloud and ask relevant questions. (*Id.*).

Dr. Correa concluded that although Ms. Hernandez "has some genuine cognitive impairment" stemming from a traumatic brain injury, "she is exaggerating her level of impairment. The true nature and extent of Ms. Hernandez's cognitive difficulties can only be assessed when Ms. Hernandez chooses to put full effort into testing and does not attempt to exaggerate or feign symptoms." (*Id.* at 17). In Dr. Correa's professional opinion, Ms. Hernandez is competent to stand trial. (*Id.*).

**Dr. Fabian's Evaluations**

Dr. Fabian originally evaluated Ms. Hernandez on July 16, 2016, and submitted a report dated August 24, 2016. (Def. Exh. B). Dr. Fabian diagnosed Ms. Hernandez with intellectual disability, mild; posttraumatic stress disorder; major depressive disorder, moderate without psychotic features; and alcohol use disorder, moderate. (*Id.* at 10).

As I discussed in my previous opinion finding Ms. Hernandez incompetent to stand trial, Dr. Fabian administered a number of neuropsychological and psychological tests at that time. (Doc. No. 46 at 4-5). Among other tests, the results of the Woodcock-Johnson Test of Academic Achievement put Ms. Hernandez's age and grade equivalents at about six-and-one-half years old to nine-and-one-half years old. (*Id.* at 4; Def. Exh. B at 7). Ms. Hernandez is in her late twenties.

When Dr. Fabian measured her intellectual functioning using the Wechsler Adult Intelligence Scale-IV, Ms. Hernandez had a Full Scale IQ of 61, which put her in the 0.5 percentile, leading to a diagnosis of mild intellectual disability. (Doc. No. 46 at 4; Def. Exh. B at 7). The results of the Neuropsychological Assessment Battery showed Ms. Hernandez's orientation as average, her "simple attention with digits forward was severely impaired," and moderate to severe impairments in her memory functioning. (Doc. No. 46 at 4; Def. Exh. B at 8-9). And on the

Wisconsin Card Sorting Test, Ms. Hernandez showed severe impairments in all areas. (Doc. No. 46 at 4; Def. Exh. B at 9).

As for effort, Dr. Fabian administered the Rey 15 Item Test. (Def. Exh. B at 9). Ms. Hernandez scored fifteen out of fifteen, indicating she was putting forth good effort. (*Id.*). Dr. Fabian also evaluated available medical records and Ms. Hernandez's self-reporting relative to the traumatic brain injury she suffered at the age of twelve. (Def. Exh. B at 4-6). And Dr. Fabian considered input from Ms. Grill concerning Ms. Hernandez's ability to interact with her. (*Id.* at 13-14). Dr. Fabian opined Ms. Hernandez was incompetent to stand trial. (*Id.* at 16).

Following her time at FMC Carswell, Dr. Fabian again evaluated Ms. Hernandez. He evaluated her on September 13, 2017, and submitted a report dated October 13, 2017. (Def. Exh. C at 1). This time Dr. Fabian diagnosed Ms. Hernandez with an other specified neurodevelopmental disorder, other specified depressive disorder, other specified trauma-related stress disorder, and alcohol use disorder. (Def. Exh. C at 10).

Because Dr. Correa's testing had raised concerns of malingering, Dr. Fabian administered the Medical Symptoms Validity Test ("MSVT"). (*Id.* at 9). The test measures learning and memory, as well as cognitive effort. (*Id.*). Ms. Hernandez's results indicated "poor effort for paired associates and free recall," but Dr. Fabian explained that her "overall scores were not below chance," meaning he would say there is poor or variable effort, but not malingering. (*Id.*).

Dr. Fabian then administered the Nonverbal Medical Symptoms Validity Test ("NMSVT"), which assesses visual learning, memory, and cognitive effort. (*Id.*). Ms. Hernandez obtained failing scores on this test, and her effort was again assessed as poor for paired associates and free recall. (*Id.*). But again, the "results were not below chance and are not indicative of malingering." (*Id.*).

Dr. Fabian then utilized the Advanced Interpretation Computer Program for Medical Symptom Validity Test, which further assesses effort. (*Id.*). Ms. Hernandez showed "possible genuine memory impairment." (*Id.*). There was no conclusive evidence of malingering. (*Id.*).

Finally, Dr. Fabian employed the Advanced Interpretation for the Nonverbal Medical Symptoms Validity Test, which "indicated poor effort was probable and that the profile is close to zero false positives in very severe impairment from dementia." (*Id.*). Dr. Fabian thus concluded "the results are consistent with either genuine memory impairment and/or poor cognitive effort, but not malingering." (*Id.*).

Dr. Fabian spoke with Ms. Hernandez and Ms. Grill together. (*Id.* at 10). Ms. Hernandez was resistant and at times disengaged. (*Id.*). Ms. Hernandez spoke about having been at FMC Carswell but could not say why she had been sent there. (*Id.*). Ms. Grill then explained to her the federal sentencing guidelines and the amount of time she might receive if convicted. (*Id.* at 11). Ms. Grill also explained that Ms. Hernandez would receive credit for time served for her pre-trial detention. (*Id.*). Ms. Hernandez initially "did not respond in a manner that displayed an appreciation as to her legal predicament." (*Id.*). Ms. Grill had to explain the guidelines to Ms. Hernandez twice more in that same meeting. (*Id.*). Ms. Hernandez was able to talk about the underlying facts of the offenses with which she is charged, but she had difficulty grasping the idea of a plea of not guilty by reason of insanity and talking about what the government would accuse her of doing. (*Id.*). Ms. Hernandez repeatedly talked of wanting to go home and wanting to know that she would not go to prison. (*Id.*). She asked Dr. Fabian and Ms. Grill for guarantees that she would not remain in confinement if she pled guilty but would then proclaim her innocence. (*Id.*). "She was perseverative in thought and continued to repeat her demands." (*Id.*). Dr. Fabian and Ms. Grill also pressed Ms. Hernandez concerning inconsistent statements she made in her evaluations, but Ms. Hernandez appeared to either lack insight or to not want to "discuss these inconsistencies that shed her in a negative and manipulative light." (*Id.* at 12).

Dr. Fabian also communicated separately with Ms. Grill as part of his evaluation. (*Id.* at 13). Ms. Grill said it took a significant amount of time to explain legal information to Ms. Hernandez and that Ms. Hernandez often remained unable to comprehend the information. (*Id.*). This was true

even when the information had been explained multiple times. (*Id.*). It was Ms. Grill's impression that Ms. Hernandez did not fully understand what they talked about, based in part on the content of the questions Ms. Hernandez asked and because Ms. Hernandez repeatedly asked the same questions each time Ms. Grill met with her. (*Id.*). Ms. Hernandez did not understand the motion to suppress that Ms. Grill filed, despite Ms. Grill's attempts to explain it in a way Ms. Hernandez might understand. (*Id.*). Ms. Hernandez also stated multiple times that she was at FMC Carswell to serve her sentence. (*Id.*).

It is Dr. Fabian's opinion that "[t]he foundation of this case and Ms. Hernandez's psychopathology and neuropathology is" the traumatic brain injury she suffered at the age of twelve. (*Id.*). Ms. Hernandez's traumatic brain injury was caused when she jumped from the back door of a moving school bus and hit her head. (*Id.*). She was unconscious, exhibited no meaningful responses or voluntary activities, was emergently intubated, had a Glasgow Coma Scale of 6, and was hospitalized from November 30, 2001 to December 19, 2001. (*Id.*). She was diagnosed with cerebral contusion, left subdural hematoma, epidural hematoma in the posterior fossa, occipital fracture, aphasia, left hemiparesis, and dysphagia. (*Id.*). Ms. Hernandez underwent craniotomies to evacuate the left subdural hematoma and the posterior fossa epidural hematoma. (*Id.*). Ms. Hernandez remained nonverbal upon release from the hospital, could consistently follow simple commands, "showed bilateral leg movements, showed spontaneous peripheral right hemibody movements, and demonstrated no left hemibody movements." (*Id.*). She also suffered memory loss, even after discharge from the hospital. (*Id.*).

Dr. Fabian sees this injury as significant, because "if an individual suffers a severe brain injury during her developmental years prior to age 18, the American Association of Intellectual and Developmental Disabilities recognizes traumatic brain injury as an etiological risk factor for intellectual disability and mild mental retardation. (*Id.* at 15). So though Dr. Fabian no longer feels a diagnosis of mild intellectual disability is appropriate, due to a lack of records and Ms. Hernandez's

inconsistent self-reporting, he believes a diagnosis of other specified neurodevelopmental disorder is appropriate. (*Id.* at 14-15).

Dr. Fabian also noted that Ms. Hernandez's test results indicate she at times puts forth variable and poor effort, as well as disengagement in evaluations. (*Id.*). But he observed no clear evidence of malingering. (*Id.*). Dr. Fabian believes that much of Ms. Hernandez's "uncooperativeness and agitation, irritability, interpersonal conflicts, apathy, and poor motivation are an outcome of her severe traumatic brain injury." (*Id.* at 16). Dr. Fabian also believes the traumatic brain injury explains Ms. Hernandez's perseverative thought and speech. (*Id.*).

And Dr. Fabian noted that Ms. Hernandez fairly consistently reported having suffered emotional trauma in her life and that she undoubtedly qualifies for one or more substance abuse disorders. (*Id.*).

In his report, Dr. Fabian addressed the complicated nature of this evaluation. "The issues of psychiatric diagnosis, English-Spanish language issues, history of special education, history of severe traumatic brain injury, and the fact that we have very limited records and no collateral information pertaining to family contacts, for example, leave this case extremely complicated to properly assess for both diagnosis and competency to stand trial assessment." (*Id.* at 14).

Taking all of this into account, in what he described as a close call, Dr. Fabian opined that Ms. Hernandez has "some islands of competency relating to comprehension and factual knowledge of her charges, some roles of court participants, and pleas," but that she is "mentally incompetent to the extent that she is unable to adequately understand the nature and consequences of the proceedings against her or to assist properly in her defense" (*Id.* at 16-17).

**Doctors' Qualifications**

As an initial matter, I will address the qualifications of the doctors. The government calls into question Dr. Fabian's neuropsychological qualifications, because part of his education was completed online. The government then highlights Dr. Correa's qualifications, because her

expertise is in assessing malingering among Spanish-speaking populations, which is a matter of particular relevance in this case.

I find both doctors to be well-qualified, if in different respects. Dr. Correa attended the University of North Texas, where she earned a master's degree in psychology and a doctorate in clinical psychology. (Gov't Exh. 1 at 1). For both her master's thesis and her doctoral dissertation, Dr. Correa wrote on the topic of malingering and detecting malingering among Spanish-speaking populations. (*Id.*). Dr. Correa also received pre-doctoral clinical training by completing a one-year forensic psychology externship at FMC Carswell and a one-year clinical psychology internship (APA approved) at the University of North Carolina School of Medicine's Department of Psychiatry and the BOP Correctional Complex in Butner, North Carolina. (*Id.* at 2).

Dr. Correa is a licensed psychologist in the state of New York and has worked as a forensic psychologist at FMC Carswell since May 2016. (*Id.*). Prior to that, she worked for nearly three years as a clinical psychologist with the BOP at the Metropolitan Detention Center in Brooklyn, New York. (*Id.*). She has also worked as a therapist and a bilingual therapist. (*Id.* at 1-2).

Dr. Fabian earned a master's degree in psychology at the University of Cincinnati and a master's degree in clinical psychology at the Chicago School of Professional Psychology. (Def. Exh. A at 7). He wrote his master's thesis on the impact of discipline and supervision practices with respect to antisocial personality disorder. (*Id.*). He earned his doctorate of psychology, with honors, from the Chicago School of Professional Psychology's APA-approved clinical psychology program. (*Id.* at 6-7). Dr. Fabian completed the Postdoctoral Neuropsychology Certificate Program at Fielding Graduate Institute in Bethesda, Maryland. (*Id.* at 6). As part of this program, Dr. Fabian completed two-hundred hours of direct clinical supervision. (*Id.*). He also completed a neuropsychology fellowship at the University of New Mexico School of Medicine. Dr. Fabian then earned his juris doctorate from Cleveland-Marshall College of Law. (*Id.*).

Dr. Fabian is board-certified in both forensic and clinical psychology. (*Id.* at 1). He has worked as a forensic and clinical psychologist through his own multi-state practice. (*Id.* at 7). He has also worked as a forensic psychologist at Minnesota Security Hospital; as a forensic psychologist consultant at the Federal Correctional Institution in Waseca, Minnesota; as a court forensic psychologist at the Forensic Psychiatric Clinic of Lake County Court of Common Pleas and Adult Probation Department in Lake County, Ohio; and as a consulting neuropsychologist and psychologist at the Juvenile Diagnostic Clinic for the Cuyahoga County Court of Common Pleas Juvenile Court Division. (*Id.* at 8). Dr. Fabian has also written a book chapter on malingering in the contexts of criminal forensic psychology and neuropsychology. (*Id.* at 3).

Based on the above, I find both doctors to be well-qualified. Dr. Correa is a qualified forensic psychologist with experience in the area of diagnosing malingering in Spanish-speaking populations. And though the government attempted to cast doubt on Dr. Fabian's neuropsychology education through the Fielding Institute because it is an online program, I find his training and his board certifications to be more than sufficient. He is a qualified forensic and clinical psychologist, and I find him to be more experienced and to have an overall broader area of expertise than Dr. Correa.

**Competency Analysis**

I must now render a finding as to Ms. Hernandez's competence to stand trial. Looking at all the evidence available to me, I have to determine whether Ms. Hernandez "has sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding—and whether [she] has a rational as well as factual understanding of the proceedings against [her]." *Dusky*, 362 U.S. at 402; *Miller*, 531 F.3d at 348; *see also* 18 U.S.C. § 4241(a). Part of making this competency determination is determining whether Ms. Hernandez is malingering. Dr. Correa defined malingering as the intentional fabrication or exaggeration of symptoms either in a psychological or

medical context for the purpose of secondary gain, that gain being some kind of tangible benefit to the individual.

This is a complicated case for all the reasons noted by Dr. Fabian and because the doctors disagree on their diagnoses of Ms. Hernandez and whether she is competent to stand trial. And neither doctor's methods or conclusions are immune to criticism. Consequently, the landscape of evidence before me paints a murky picture.

Looking first to Ms. Hernandez's factual understanding of the proceedings against her, both doctors agree she has demonstrated some basic ability to recognize the charges brought against her; the facts underlying those charges, at least from her perspective; the roles of some courtroom participants; and the basic plea options of guilty and not guilty. I am not confident she has a complete factual understanding of the proceedings, but she has some sort of baseline understanding.

More difficult is the question of whether Ms. Hernandez has a rational understanding of the proceedings against her and whether she is able to rationally consult with her lawyer and assist in her own defense. Since questions concerning Ms. Hernandez's effort and possible malingering impact much of what I am to consider, I will address that matter first.

It is undisputed that, at the very least, Ms. Hernandez has exhibited variable or poor effort in her testing. What is at issue is whether she is malingering. The government asserts that Ms. Hernandez is fabricating or exaggerating her symptoms in an effort to avoid a criminal conviction or to obtain a sentence of time served. The government contends that, because both Drs. Correa and Fabian made findings of poor or variable effort, the first prong of the definition of malingering is met.

But poor effort and malingering are not synonymous. To malinger is to feign or to exaggerate symptoms of, in this case, incompetence in an effort to achieve a desired result. And even malingerers, the government concedes, can still be incompetent. But it is the government's

position that Ms. Hernandez's behavior, taken in conjunction with her malingering diagnosis, is enough to prove she is both competent and malingering.

Dr. Correa explained that a person is suspected of malingering when "there is a potential personal gain in a medico-legal context, a discrepancy between the person's report of symptoms and objective findings, a lack of cooperation during testing and treatment, or the presence of Antisocial Personality Disorder." Dr. Correa administered three tests designed to gauge Ms. Hernandez's test-taking effort, diagnosed her with antisocial personality disorder, and analyzed her behavior, ultimately concluding that she is competent and malingering.

Ms. Hernandez showed suspect effort on the b Test, a lack of maximum effort and a likelihood of exaggerated memory deficits on the TOMM, and suspected malingering on the SIMS, according to Dr. Correa's interpretation of the results. Ms. Hernandez is also known to be a poor historian, as noted by both Drs. Correa and Fabian. Dr. Correa characterized this inconsistent self-reporting as deceitful behavior evidencing malingering. And Dr. Correa diagnosed Ms. Hernandez with antisocial personality disorder. To support this diagnosis, Dr. Correa cited Ms. Hernandez's flippant disregard for the rules, as evidenced by her laughing and giggling while telling Dr. Correa of her substance abuse and ability to communicate better than others while under the influence. Dr. Correa also relied on Ms. Hernandez's self-reported use of illegal substances as a teenager and impulsive decision to jump from the back of a moving bus as evidence of conduct disorder before the age of fifteen.

Having thus observed what she considered to be evidence of Ms. Hernandez's suspect effort, inconsistent reporting, and antisocial personality disorder, Dr. Correa considered whether Ms. Hernandez might have something to gain by feigning incompetence. What pushed Ms. Hernandez over the line into a diagnosis of malingering, according to Dr. Correa, was her professed desire to avoid criminal charges on her record. Ms. Hernandez also repeatedly talked about not wanting more time in confinement. This indicated to Dr. Correa that Ms. Hernandez is doing more than

exhibiting poor effort. Dr. Correa concluded Ms. Hernandez is feigning incompetence to achieve her goals of avoiding a criminal conviction and more time in confinement.

But Dr. Fabian disagrees with this conclusion and the route Dr. Correa took in getting to her diagnosis of malingering. Concerning Dr. Correa's effort testing, Dr. Fabian testified that Ms. Hernandez's results on the SIMS should be considered with caution, as the test proves problematic when administered to those who cannot read above a fifth-grade level or those who are nearly or actually intellectually disabled. Dr. Fabian believes it possible that Ms. Hernandez's reading level is below the fifth-grade mark, so he testified he would not administer the SIMS to a defendant such as her.

Dr. Fabian also disagrees with Dr. Correa's interpretation of Ms. Hernandez's score on the TOMM. Dr. Fabian explained that true malingerers would likely have scores below chance and below twenty-five on the trials. Ms. Hernandez scored well above that mark on her trials. Dr. Fabian agreed, however, that failing the retention trial is indicative of suboptimal effort. Overall, Dr. Fabian interpreted Ms. Hernandez's TOMM scores as indicating that she put forth suboptimal and variable effort, but not that she is malingering. As for the CTONI-2, Dr. Fabian agreed that Ms. Hernandez's score was below what he would have expected, given the results of the tests both he and Dr. Correa administered.

Dr. Fabian also disputes Dr. Correa's diagnosis of antisocial personality disorder. He explained that in order to arrive at this diagnosis, there would need to be evidence of conduct disorder exhibited by Ms. Hernandez by the time she was fifteen. This evidence would include breaking the law and having difficulty conforming her behavior to the requirements of the law, such as engaging in fighting, theft, bullying, and destroying property. As I noted above, Dr. Correa relied on Ms. Hernandez's self-reported use of illegal substances as a teenager and impulsive decision to jump from the back of a moving bus as evidence of conduct disorder before the age of fifteen.

Ms. Hernandez, however, has varied significantly in reporting these behaviors, so it is difficult to ascertain what actually happened. For example, Ms. Hernandez gave different reasons to different examiners for jumping out of the bus. As I noted in my previous competency determination, there was some suggestion that Ms. Hernandez was suffering from depression in the months leading up to the accident. It was not until she arrived at FMC Carswell that Ms. Hernandez reported having had marijuana on her person and jumping out of the bus to avoid being caught with it.

Dr. Fabian further noted that Ms. Hernandez has no juvenile or adult criminal records and that even if she had acted out during adolescence, it could be attributable to the dysfunctional home environment in which she grew up or the brain injury she suffered in her early adolescent years.

Dr. Fabian also differently characterizes Ms. Hernandez's tendency to repeat her desires to avoid a conviction on her record and to avoid more time in prison. He sees this behavior as perseverative thought and speech caused by her brain injury. So Ms. Hernandez might have this continual and involuntary focus on what she wants, but she may not be able to utilize rational abstract thinking to get what she wants. As Dr. Fabian pointed out, Ms. Hernandez has been detained for nearly two years in this case which could since have been resolved if not for questions concerning her competence.

Dr. Fabian also performed effort testing, once as part of his first evaluation and again after Ms. Hernandez's time at FMC Carswell. Dr. Fabian originally ruled out malingering by administering the Rey 15 Item Test, but he conceded that it is a less sensitive test of malingering. So he performed more tests following Dr. Correa's diagnosis of malingering. Ms. Hernandez's test results on the MSVT and the NMSVT indicated poor effort, but not malingering. Her results on the Advanced Interpretation Computer Program for Medical Symptom Validity Test indicated she might have genuine memory impairment, and there was no conclusive evidence of malingering. Finally, utilizing the Advanced Interpretation for the Nonverbal Medical Symptoms Validity Test,

Dr. Fabian determined that Ms. Hernandez probably put forth poor effort. Dr. Fabian interpreted these results to mean Ms. Hernandez has genuine memory impairment, poor cognitive effort, or a combination of the two, but that she is not malingering. He attributed her variable and poor effort to her traumatic brain injury and also recognized that the stress of her situation might have affected the effort she put forward.

Having considered the opinions of both doctors, I give more weight to Dr. Fabian's assessment of Ms. Hernandez's effort. It is true that Dr. Correa and her team at FMC Carswell had an obvious advantage, in that they were able to observe Ms. Hernandez over a span of four months, while Dr. Fabian only had two days with Ms. Hernandez. I also do not take for granted Dr. Correa's belief that the malingering classification should be used conservatively and that she has only ever diagnosed four people as malingering.

But I wonder at Dr. Correa's approach to assessing Ms. Hernandez. The primary focus of Dr. Correa's evaluation appears to have been looking for evidence of malingering. Three of the five tests Dr. Correa performed were designed to assess Ms. Hernandez's effort and to detect malingering. Granted, testing by both doctors revealed at least variable effort by Ms. Hernandez, sometimes likely poor effort, but the results of these tests are couched in terms of possibilities or likelihoods, not definitive findings. Dr. Correa then relied, at least in part, on Ms. Hernandez's self-reporting and possibly innocent behaviors to formulate her diagnoses.

I also hesitate to classify Ms. Hernandez's inconsistent self-reporting as a deliberate and deceitful act. Dr. Correa did not explain why she concluded Ms. Hernandez's inconsistent self-reporting must be deceitful, as opposed to, perhaps, the result of genuine memory issues stemming from her traumatic brain injury. I agree that, if she is truly malingering, Ms. Hernandez could use inconsistent self-reporting as a means to further her act. But I also agree that someone who suffered a traumatic brain injury at the age of twelve likely has genuine memory issues. And I need more

than circular reasoning between Ms. Hernandez's suspected malingering and purported deceitfulness to assign a motive to her inconsistency.

I am also persuaded by Dr. Fabian's characterization of Ms. Hernandez's repeated desire to avoid a conviction and more time in prison as perseverative thought and speech. Ms. Hernandez repeatedly made these desires known to both doctors. Her main focus appears to be on avoiding more time in confinement, as this is the desired outcome she kept coming back to, even at the cost of a criminal conviction. Ms. Hernandez stated she was willing to plead guilty if she would be sentenced to time served, despite adamantly maintaining her innocence. When she met with Dr. Fabian and Ms. Grill, Ms. Hernandez repeatedly sought assurances that she would not be sentenced to incarceration if she pled guilty. She would then vacillate between not wanting to plead guilty and not wanting to spend time in prison. But she was repeatedly drawn back to this desire to avoid more time in confinement, despite the cost, and she appears to have broached this subject at times when Dr. Fabian or Ms. Grill were discussing other things with her. So this behavior look less like strategic goal-setting and more like an unrelenting focus on avoiding more time in confinement, often to the exclusion of other considerations.

Logically speaking, feigning incompetence is incompatible with the goal of quickly securing one's release, because questions of competence halt the overall proceedings and lead to evaluations and litigation of the competency issue. As it has played out here, Ms. Hernandez has now been incarcerated no less than twenty-two months, and the case has yet to progress beyond the filing of suppression motions. So if her goal is to shorten or avoid time in confinement, her efforts are counterproductive. She is actively working against her own goal, which cuts against a finding of competent malingering. But it is clear to me that Ms. Hernandez showed some degree of poor and variable effort on her testing, so I will take that into consideration.

Looking next to Ms. Hernandez's cognitive functioning, the parties agree this is difficult to assess, given her questionable effort. Dr. Correa administered the CTONI-2 to measure Ms.

Hernandez's cognitive functioning. Ms. Hernandez scored in the very poor range, but Dr. Correa invalidated that score in light of Ms. Hernandez's effort scores. Dr. Correa ultimately concluded that Ms. Hernandez's cognitive difficulties can only be accurately assessed once Ms. Hernandez starts putting forth full effort and stops feigning symptoms.

Dr. Fabian originally assessed Ms. Hernandez as having an IQ of 61. Dr. Fabian did not, however, address in his report Ms. Hernandez's effort as gauged by the embedded scale within the IQ test she took, nor was he able to address it at the competency hearing. But considering Ms. Hernandez's questionable effort in other testing, Dr. Fabian conceded that he could no longer verify that Ms. Hernandez has a true IQ of 61. He is still of the opinion that she is at 70 or below, but he cannot give an exact number. Dr. Fabian also administered several other tests and concluded that Ms. Hernandez is operating at a grade and age equivalent between six-and-a-half and nine-and-a-half years old and is severely impaired in all areas.

I appreciate the difficulties faced by both doctors in trying to establish the bounds of Ms. Hernandez's cognitive functioning, knowing that she did not fully exert herself in her testing. The various test results fairly consistently show she is severely diminished in capacity, but it is unclear to me where exactly she falls once her scores are adjusted in light of her effort. But since the degree and cause of her poor effort are indeterminate, I am not prepared to altogether invalidate those results. I will instead look to other evidence indicating Ms. Hernandez's competence and rely more heavily on that.

In addition to Ms. Hernandez's effort, Dr. Correa and the government point out other weaknesses in Dr. Fabian's testing that could have affected Ms. Hernandez's results. They take issue with Dr. Fabian having administered tests in English when Ms. Hernandez says Spanish is her primary language. Dr. Fabian initially evaluated Ms. Hernandez without the assistance of an interpreter, and at that time, she did not indicate an inability to understand him. He later evaluated her with an interpreter present. In Dr. Sherman's evaluation of Ms. Hernandez, he noted that she

can speak English but that she said she does not like to. (Doc. No. 41). Dr. Sherman was assisted by an interpreter in that evaluation, but he noted that Ms. Hernandez spoke to him in English on some topics. (*Id.* at 1-2). Ms. Hernandez's current attorney noted that he, himself, has met with her both with and without an interpreter and that he does not have any problems communicating with her in either situation. So I find it unlikely that Ms. Hernandez's preference for Spanish significantly impacted her results.

Dr. Correa further opined that Ms. Grill's presence for part of Dr. Fabian's interview could be problematic. While an attorney's input regarding the difficulties she has had communicating and working with her client is useful for doctors to consider as part of their evaluations, Dr. Correa testified that the attorney's presence could cause what is known as the observer effect. Essentially, individuals may perform differently on psychological tests when they know they are being watched. This can bias the test results. Observers with authority, such as attorneys, can be especially problematic, because they may have a vested interest in the results of the test. The test-taker might then alter her behavior accordingly.

Cutting against this is the fact that Ms. Grill was not present for the entire evaluation. Also, Dr. Fabian's observations of Ms. Hernandez's interactions with himself and with Ms. Grill confirm what Ms. Grill independently described to him concerning her one-on-one interactions with Ms. Hernandez. And Dr. Fabian was able to observe and assess Ms. Hernandez's ability to consult with her lawyer. I therefore find Ms. Grill's presence for portions of Dr. Fabian's evaluation did not unduly impact his evaluation.

Next, Drs. Correa and Fabian disagree on the impact Ms. Hernandez's brain injury currently has on her cognitive abilities. Dr. Correa diagnosed Ms. Hernandez with mild neurocognitive disorder due to her traumatic brain injury. Dr. Correa noted that Ms. Hernandez "demonstrates mild distractibility and intermittently slow cognitive processing when answering questions," both of which become less evident if Ms. Hernandez is given more time to answer or if questions are

rephrased or repeated for her. Dr. Correa hypothesized that Ms. Hernandez's chronic drug use may have contributed to her cognitive difficulties. Dr. Correa classified Ms. Hernandez's impairment as mild, because Ms. Hernandez was able to "complete complex activities of independent living," such as navigating FMC Carswell and attending activities independently.

Dr. Fabian disagreed with Dr. Correa's assessment of mild neurocognitive impairment, stating that she gave insufficient attention to Ms. Hernandez's brain injury. Dr. Fabian characterized Ms. Hernandez's neurocognitive disorder as major, because the early signs of brain injury were severe. This then would put Ms. Hernandez in the range of a major neurocognitive disorder, not mild.

Given the severity of Ms. Hernandez's traumatic brain injury and considering all the evidence before me now, I remain convinced, as I was when I made my original competency determination, that her brain injury had a profound and damaging effect on her mental development and functional abilities.

There is further disagreement on other diagnoses and behaviors that factor into determining whether Ms. Hernandez is competent to stand trial. Ms. Hernandez consistently reported alcohol abuse in her different evaluations, leading both doctors to agree on a diagnosis of alcohol use disorder. But Dr. Correa also diagnosed Ms. Hernandez with severe substance use disorders relating specifically to cannabis and cocaine, based on Ms. Hernandez's inconsistent self-reporting.

Ms. Hernandez originally reported to Dr. Fabian that she had used cocaine once but did not report using any other illegal substances. Dr. Fabian also noted that Ms. Hernandez had no treatment records for drug abuse. Ms. Hernandez told a different story at FMC Carswell. It is noted on her forensic intake examination dated February 28, 2017, that Ms. Hernandez reported previously using cocaine occasionally at parties but that she had stopped using cocaine long before the examination. Then in her forensic examination summary report dated June 28, 2017, Dr. Correa wrote that Ms. Hernandez said her mother had taught her to smoke crack at the age of eleven. Ms.

Hernandez also reported that she began regularly using marijuana at the age of twelve and that by the age of fifteen she was "consuming unspecified amounts [of] marijuana, cocaine, and alcohol on a daily basis, combined with occasional use of ecstasy and crystal methamphetamine." In that account, Ms. Hernandez reported using illegal substances daily until her arrest and experiencing withdrawal symptoms when not on these substances.

Despite these inconsistencies, Dr. Correa relied exclusively on Ms. Hernandez's self-reporting in making her diagnoses concerning severe drug use disorders. Dr. Correa then attributed Ms. Hernandez's family conflict and bus accident to her substance abuse. Because Ms. Hernandez was significantly inconsistent in recounting her history of drug use, and because there are no records corroborating any of her accounts, I will not consider drug abuse as a contributing factor in her cognitive difficulties.

Next, the government and Dr. Correa highlight what they see as other evidence of Ms. Hernandez's competence. They make much of Ms. Hernandez's ability to navigate life independently at FMC Carswell. She was able to physically get where she needed to be, and she asked questions of Dr. Correa when she had them. Ms. Hernandez also knew whom to ask to obtain medication to aid her in sleeping when she felt she needed it. She also spoke with Ms. Grill about an inmate she wanted to fight before fighting the inmate, which the government and Dr. Correa see as evidence of Ms. Hernandez's ability to receive advice, weigh her options, and then decide on a course of action.

It is true that Ms. Hernandez learned to independently navigate life at FMC Carswell, but the evidence before me suggests she did not acclimate to her new surroundings so smoothly. Staff at FMC Carswell stated that Ms. Hernandez disregarded the institution's rules and adopted a negative attitude when directed to comply with the rules. Ms. Hernandez's behavior also earned her several informal warnings and formal penalties. Ms. Hernandez arrived at FMC Carswell in late February. In March, Ms. Hernandez was penalized for doing her laundry outside of her scheduled time. She

said she did not know there was a rule regarding when she could do her laundry. In May, Ms. Hernandez was punished for showering during count. She said she did not know there was a rule regarding when she could shower, and she did not know why it was important to be present for count instead of engaging in other activities. Then in June she fought another inmate, because she thought the inmate had been spying on her. Ms. Hernandez also believed the inmate had friends who worked in the kitchen and had directed them to spit in her food and "put it in their private parts" because the inmate did not like her.

Ms. Hernandez was also irritated by having to attend competency restoration classes every week. She asked Dr. Correa if she could withdraw from the classes. Ms. Hernandez often arrived late or missed appointments, and she missed several classes. When she did attend classes, she was resistant and disengaged, sometimes blaming her behavior on her difficulties with the English language. But she exhibited the same behavior in the Spanish competency restoration classes. She only participated in the Spanish classes when Dr. Correa specifically asked her to or when she felt pressured by her peers, at which time she demonstrated that she could read and ask relevant questions.

This behavior can cut either way. It could be that Ms. Hernandez was unwilling to follow the institution's rules and fully participate in the competency restoration program. Or perhaps she was unable to fully comprehend why she was sent to FMC Carswell. For example, Ms. Hernandez stated on more than one occasion that she was there to serve her sentence. She also appears to have lacked an appreciation of her need for competency restoration, as she missed several classes and asked to withdraw from the classes altogether. Finally, Ms. Hernandez fought another inmate because she suspected that inmate of spying on her and plotting against her with the kitchen workers. She may have demonstrated some forethought by discussing her desire to fight this inmate ahead of time, but her motive for fighting was rooted in her suspicious perception of the inmate.

Taking all of this together, Ms. Hernandez's behavior weighs slightly more in favor of a finding of incompetency.

Finally, the doctors also evaluated Ms. Hernandez's ability to interact with her lawyer and assist in her own defense. As part of his evaluations, Dr. Fabian spoke with Ms. Grill regarding her interactions with Ms. Hernandez. Ms. Grill believed that Ms. Hernandez was unable to comprehend matters related to her case. For example, Ms. Hernandez was unable to understand the suppression motion that Ms. Grill filed on her behalf. Regardless of whether questions were asked in English or Spanish, Ms. Hernandez often responded with answers that had nothing to do with the questions asked. Ms. Hernandez also repeatedly said that she had been at FMC Carswell to serve her sentence. And she did not retain information that Ms. Grill had explained to her multiple times. Dr. Fabian observed the same difficulty when he and Ms. Grill met with Ms. Hernandez together. Ms. Grill explained the sentencing guidelines three times, and still Ms. Hernandez did not respond with much of a rational appreciation of what Ms. Grill had explained to her.

In her evaluation, Dr. Correa determined that Ms. Hernandez liked Ms. Grill and felt she could be open with her. Ms. Hernandez stated that she expects her attorney to get her out of prison and to explain her options to her. She also understands how to behave in court.

Ms. Hernandez also attended both English and Spanish competency restoration classes while at FMC Carswell. Each class met once a week for one hour. Dr. Correa testified that these classes covered the factual information a defendant needs to know, such as the roles of various people involved in the legal process, types of available pleas, relevant vocabulary words, and the implication of having witnesses in one's case. Dr. Correa testified that the instructors began by addressing basic factual information and then moved into discussing hypothetical scenarios, at which point class attendees were asked to weigh in on what reasonable decisions might be made in a particular situation. Class participants also had the opportunity to role-play different courtroom scenarios, and they were quizzed to test their progress and knowledge.

Ms. Hernandez and Dr. Fabian find fault with the competency restoration classes. To begin, Ms. Hernandez points out that the competency restoration team did not include anyone from the legal profession. No one on the team had experience defending or working with a client in the legal context, so the team lacked an understanding of what it means for a defendant to assist in her own defense.

Additionally, Ms. Hernandez and Dr. Fabian are troubled by the lack of depth and personalization in the competency restoration classes. Dr. Correa taught the Spanish competency restoration classes, but she was unable to testify to the specific content of the English classes. The two classes are generally the same, but individual classes may play out differently based upon questions asked by class participants. So Dr. Correa testified to the content of the Spanish restoration classes she taught.

In those classes, Dr. Correa addressed the difference between pleading guilty, not guilty, and not guilty by reason of insanity, and she addressed the consequences of those pleas. She also discussed a defendant's Fifth Amendment right to remain silent and the possibility and benefit of waiving that right in certain situations, and she explained the process of selecting a jury. Dr. Correa also thought some of the role-play scenarios addressed deciding whether to try one's case before a jury or a judge.

But Dr. Correa did not address the procedure of changing one's plea from not guilty to guilty, nor did she recall discussing the specific rights a defendant gives up when pleading guilty. She also did not discuss the government's burden of proof in a criminal trial or how the sentencing guidelines work. And no one from FMC Carswell reached out to Ms. Grill to ascertain why or how she was having difficulties interacting with Ms. Hernandez, so they could not address those particular difficulties.

Acknowledging that it is inappropriate for her to give legal advice, Dr. Correa testified that when defendants have specific legal questions, she refers them to their attorneys or to the law

library.  So when Ms. Hernandez asked Dr. Correa how the sentencing guidelines work, Dr. Correa referred her to her attorney.

Participating in one's defense is more than rote memorization of the different participants in the legal process.  It requires, at a minimum, a real understanding of the charges one is facing, the advantages and disadvantages of pleading guilty or going to trial, potential punishment, one's constitutional trial rights, and the ability to take in all that information and make informed decisions for oneself.  I am not convinced Ms. Hernandez has this capability.

I am particularly struck by her repeated assertions and demonstrations to Ms. Grill, to her evaluators, and to me that she does not understand what is happening in this case.  For example, she has not been convicted of the crimes with which she is charged, but she has at times believed that she was sent to FMC Carswell to serve out a sentence.  She has also suggested multiple times that she has been charged with a probation violation, which she has not been.  Neither has she been able to grasp legal concepts, like seeking to suppress evidence based on an alleged constitutional violation.

I have also had the opportunity to observe Ms. Hernandez in proceedings before me.  She typically sits with her arms crossed and has a flat affect.  She appears devoid of emotion, rarely exhibiting a visible response to what is being said.  At her last competency hearing, she barely interacted with her current attorney, only doing so when he initiated contact with her.  Otherwise, she stared at the table or looked around the room while listening to the interpreter's voice through her headphones.  I am convinced she was listening, because twice she reacted to things that were said, speaking out inappropriately on one of those occasions.  But given her lack of interaction with her attorney and her overall demeanor, I am not confident she could appreciate what was happening at the hearing.

Ms. Hernandez completed the competency restoration program at FMC Carswell, and this program perhaps aided her in gaining a better factual understanding of how the legal system works.

But I share the same concerns about the program that Ms. Hernandez and Dr. Fabian expressed. The classes were not tailored to her particular needs, and Ms. Hernandez continued to have the above-mentioned difficulties after she returned from FMC Carswell.

Taking all of the above into account, I find the government has failed to prove Ms. Hernandez competent to stand trial. The government has demonstrated that Ms. Hernandez has some factual understanding of the proceedings against her, but that is not enough. To be deemed competent, she must be able to appreciate the nature and consequences of the proceedings against her and to properly assist in her defense, and I find she does not have that ability. While perhaps a close call, ultimately I find there is slightly more evidence supporting a finding of incompetence with respect to Ms. Hernandez.

## CONCLUSION

Accordingly, I find Ms. Hernandez is not competent to stand trial. The criminal charges against her are dismissed.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
